Good morning and welcome to the Ninth Circuit. Before we begin with the argued cases, a little housekeeping. We've got three cases submitted on the briefs. Dorciano v. Dorciano, Ludwig v. State of Arizona, and Kinchy v. Federal Express. All submitted on the briefs. We've got two argued cases this morning. East Bay Sanctuary Covenant and Innovation Law Lab. We've read your briefs. We look forward to your argument. First case, East Bay Sanctuary Covenant v. Trump. When you're ready. Thank you, Your Honor. May it please the Court, I'm Scott Stewart on behalf of the United States. If I may, Judge Fletcher, I'd like to try to save five minutes for rebuttal. Okay. We'll try to help, but watch the clock. Very good. Thank you, Your Honor. In this case, the district court enjoined nationwide an important rule designed to address a crisis at our southern border that is overwhelming our asylum system. A divided motions panel of this Court declined to stay that injunction, but its ruling was mistaken. The district court's injunction is profoundly flawed. We submit that this panel should vacate the injunction or at least narrow it. I'd like to get right to the effect of the motions panel's ruling on matters before this Court, Your Honor. As we've explained in this case and, of course, in the next case, the government's position is that the law of the circuit rules does not apply to the motions panel decision in this case. We're asking for, given this Court's past decisions, normal law of the case treatment, including the exceptions that apply to that treatment for developments in the record and clear errors. We would submit in this case that development of the record, the administrative record, was submitted after the motions panel decision, as well as errors that we have described in our subsequent merits briefs show that those exceptions apply and that the Court should reject certain of the merit panels. Putting to one side the question of further development of the record, is it your position that if this panel were to disagree with the question of law decided by the motions panel, we can ignore it? I think it would have to meet the clearly wrong standard of law of the case treatment, Your Honor. That's what we're pressing here. Why? I mean, if I've got a three-judge panel opinion in an ordinary case decided several years ago, and I'm now sitting on a three-judge panel, I can't say I'm going to ignore it because it's clearly wrong. So why can I ignore what the motions panel did here? Only if I think it's clearly wrong. Right. I think, Your Honor, that, again, we're describing a situation here where, as a motions panel, things are moving very quickly, briefing is truncated, the panel decided fast without argument and without the record, and that in that context, in that motions panel emergency stay context, it's not so much ignoring, it's just if there's a clear error. Is it that the question is different before the motions panel? That is, the motions panel is implementing ENCAN, that is, the government asked for a stay pending appeal, correct? I — Is that question that was before the motions panel qualitatively different than the merits panel now reviewing whether or not the district court abused its discretion under Winter? I think that could — that could be a consideration in different cases. I do acknowledge that that could be harder, perhaps, on some legal questions, Your Honor, given that — that may be unaffected by the record, but I think that would be a potential consideration there. Your clearly wrong standard is not what you said in your brief, at least as I read your brief, on a question of law. If we disagreed, we could disagree. I — at page 24 of our brief, Your Honor, we did argue for a clearly erroneous standard. Again, I'm not — I'm not saying that we would necessarily — if this were to go en banc and we — and the court were to consider anew how to treat law of the case exceptions, perhaps we would be able to reconsider and present an argument when the court were to decide that matter anew. But for now, at page 24 of our brief, we did say that the motions panel prior decision should not be treated as binding in the way the law of the circuit rule would treat something as binding, and we explain that's because in the next sentence at page 24 certain rulings were clearly erroneous. I do recognize that's — that's no small — no small showing, but we submit that we have hit it here, and there are, in particular, some points that we think that the district court just didn't — or, sorry, that the motions panel didn't address on — on particularly some of the justiciability issues. And what are we supposed to do with the Lair case? Your Honor, our position on Lair is — I agree that it is perhaps the most on-point case because it does say — it does contain that statement about the treatment of published motions panel decisions, Your Honor. Our position is that that statement in Lair case is dicta. The panel went on to acknowledge later on that same page that prior merits panels had reached the same conclusion that that — that panel had reached. And it also involved a narrower issue about how to interpret a Supreme Court decision, which arguably lacks the momentousness of a — of a legal — question of legal interpretation. So I'd say that's our kind of opening position, Your Honor. You know, normal law-of-the-case treatment with its exceptions. With that, I'll turn to — to a number of points, both on justiciability and — and the merits, Your Honor. I want to hit very briefly the Havens realty standing issue, and then touch upon zone of interests. This is not a Havens case. This is not a case where you meet the high bar that you have in Havens. Havens involved a situation. It recognized organizational standing for an association that was trying to get honest information to link people up who were trying to buy homes, that sort of thing. And the harm claimed in there, a Fair Housing Act harm, was that people were — were lying and — and, you know, out of — out of racist steering practices to give them wrong information. So there was action by the defendant directly in the teeth of the very thing that — that the organization was trying to do here. Respectfully, we don't have anything comparable in this case. This involves an — organizations that are helping third-party aliens. Those aliens, they can still apply for asylum. They can still go to ports of entry. It's speculative as to how those might affect the — the organization's operations. But that — what you're saying right there, that sounds like a third-party standing argument rather than an organizational standing argument. I think what I'm — I think what I'm — I'm saying there, Your Honor, is that the rule is not directed at the organizations, and therefore, you don't have the direct effect of the complaint on action on the plaintiff. But it clearly has an effect on the organization, or at least that's what the organization contends. And we — and our response there, Your Honor, is — is two points. One is that the effects are going to be speculative. It's — it's not clear — the plaintiffs have not established how that's actually going to affect their bottom-line operations. As — as we've explained, part of the logic of the — Does that — if it's speculative, does that mean that the district court should take evidence on the consequence? I think on questions of standing, I — I believe the law is that the court — the court can take, you know, declarations and potentially it'll — perhaps at a later state of the case, you know, other — other evidence, depending on — on things at that stage. I'd say right now, Your Honor, we have — what we have are some declarations, and they just don't pass legal muster. They're just not enough to show that this harm is definitely going to happen, especially because this rule preserves the ability for — for many people to apply for asylum and — Well, you're back to a third-party standing argument. Again, I don't think so, Your Honor, because the — the problem that I'm focusing on is that there's nothing that's flying in the teeth of these organizations' operations. It's — it's all speculative. And there's also the second — the second kind of alternative point, that the harms here, even if they were not speculative, are not cognizable. They — they do hit that — that — the third-party — the concerns of third parties of not having the law applied to them or having changes in the law applied to them. So at the outset, I think this is just very different in kind from havens where you don't have that direct — that direct injury. As to zone of interest, I'll say briefly, Your Honor, this Court has very strong precedent emphasizing that immigration challenges — challenges to — regarding the removal process. This is under JEFM, for example. And just under the square text of the INA, Section 1252 itself, the real focus of the INA is helping individual aliens. It's — it's not for organizations. They are outside. Even the provision in 1158 that the — the State panel pointed to that mentions organizations, that's about helping aliens. It's about getting notice and help to aliens. So our submission here is that the organizations just don't fall in the zone of interest, so we don't even need to get past the justiciability points. I acknowledge, again, the State — the State panel's decision on those, and we just submit that those — those are wrong and that the motions panel didn't address aspects of, say, 8 U.S.C. 1252. And similarly, just going back to standing for a moment, didn't consider just the parties or — or the lack of a legally protected interest. If I can hit the merits and kind of the top-line merits position here, Your Honor, this rule is a valid exercise of asylum authority. The district court ruled that this — and the motions panel ruled that this did conflict with Section 1158a1. As we've explained in our brief, the problem with that is that a1 deals only with a broad right to apply. That is a general rule, as it says, and it's immediately followed by exceptions even to that broad right to apply, and then it's followed by a number of exceptions about the — or a number of limitations, discretionary — discretionary features, and eligibility bars in 1158b. This — this — this ability to apply for asylum, Your Honor, doesn't guarantee any substantive outcome. And 1158, just given the discretionary nature of asylum, it doesn't say that asylum must be granted in any particular case. No matter how meritorious someone might — might seem, no matter whether they meet all the standards, it's something that may be granted in — in the Attorney General or Secretary's discretion. It's a little bit — Your Honor, this is a little bit like the right to petition the government or present a grievance. That — that right, that entitlement to submit something, does not guarantee any sort of substantive outcome. And that's particularly salient here because this — this authority to grant asylum is imbued with discretion. The only times in 1158 — Breyer, how does all this relate to the text of the — of the statute? Sure, Your Honor. 1158a1. 1158a1. And 11 — I think it's b2c. 1158b2c. Sure, Your Honor. So that — that in keeping with the past authority of — of establishing bars to asylum, which — which Congress had largely codified earlier on in that provision, that recognizes that in some cases the Attorney General and Secretary would retain discretion to just bar grants of asylum to entire categories of people who might otherwise want it. That — that is a blunt instrument, but it's one that Congress adopted. And it's one that — one that Congress authorized the Attorney General to use. It's somewhat unusual to — But you're giving a very general sweep to the text of these two statutes. I — I don't think so, Your Honor. I'm happy to home in on the key text. That — that's a — Well, it says any — 1158a1, any alien who is physically present in the United States, and this is what's significant, per ren, whether or not at a designated court of arrival. Right. Right. And we don't disagree that there is a — a broad entitlement to apply for asylum, Your Honor, but the statute is very clear in setting out those application requirements, that general rule of — of entitlement to apply. And then it — immediately there are large categories of people. Correct. If you go to, apparently, the authority for implementing the rule here that we're dealing with, it comes from 1158b2c, correct? Yes, Your Honor. It says the Attorney General may by regulation establish additional limitations and conditions not inconsistent. Correct, Your Honor. With this section — with this section under which an alien shall be eligible for asylum under paragraph 1. Right. And the key point there, Your Honor, is that this is consistent with this section because nothing else in this section guarantees that any — that somebody who applies to asylum, that any category of folks who are entitled to apply, nothing in section 1158 guarantees that they will be granted asylum. Well, it seems kind of odd that Congress has pretty specifically set out when an alien can apply, you know, whether or not at a designated port of entry, and then the agency comes along and promulgates a regulation that basically just wipes that out. I don't think so, Your Honor. How is that consistent with the text of the statute? It's a reasonable way to kind of move through things, Your Honor. I mean, a general right to apply and then kind of other operative steps happen from there. It's easy to start with a general rule. You know, similarly, as I mentioned before, the right to petition, Your Honor, it's not qualified by, you know, who can petition, but it doesn't guarantee an outcome. It is unqualified. But then we get to immediate limitations, and critically, the discretionary nature of asylum always remains there, and no one ever has to be granted asylum in a particular case. That's — Well, nobody's going to quarrel with that. I understand that. Right, Your Honor. But the upshot of that, the upshot of that is that Congress recognized that the Attorney General could establish additional conditions and limitations. Those are — the one established under the rule here is consistent with section 1158 in significant part because no one is entitled to be granted asylum. You know, there's nothing barring consideration of manner of entry in the ultimate decision whether to grant asylum that has long been understood to be a factor that can be considered. Anytime something's a factor, it's necessarily going to logically be capable of being outcome-determinative in some cases. And given Congress's decision to authorize the Attorney General to elevate things to a categorical bright-line rule, there's nothing barring the Attorney General and Secretary from doing so in this case, Your Honor. I see — I see I'm hitting about five minutes. I'd be happy to reserve the remainder. Well, before you do, I'd like you to address the APA notice and comment question because there seems to be a fairly decent argument that this is legislative rulemaking rather than interpretive, and it should have been done by notice and comment. Your Honor, in this case, we aren't quarreling. It's the next case that we're taking that involves the whether it's a general statement of policy issue. In this case, our position is simply we're accepted from advance notice and comment rulemaking because we have both good cause and foreign affairs grounds for doing  And I think the good cause, Your Honor, I think the district court — this shows, I think, an important point that I'm happy to address quickly, is that the district court looked at the record when it had things back before and after the State panel's decision and said, look, the record does contain this evidence that shows how migrants do respond to — to, you know, known incentives. They hear about news. They hear about how the policies are being deployed in the United States and how those affect their interests and their equities. So, you know, smugglers tell people, you know, come as a family unit. You know, people can't be detained. The district court looked at that, and the rise in family unit increases, which is really a big — a big challenge in this — in this area, and the district court And that argument goes to the 30-day warning, that is to say, if the notice and comment were, here it is, and then it's not going to go into effect for 30 days, that that would have a significant impact on the policy. That's the argument. I think it's more than 30 days, Your Honor, because, I mean, just as a matter of practical reality, when you issue a rule, it's going to take 30 days to receive comments, to address those comments. And, I mean, in this — in this case, my understanding is that quite a few number of comments were — were submitted, and it just takes time to address those. So it's not going to, as a practical matter, be just 30 days. It's going to take longer. And that's — that's the concern, is that there would be a — So how long is the statutory period for notice and comment? 30 days, you know, absent an exception. So if the government's in a big hurry, it can answer pretty fast, too. It can, Your Honor. But, again, it's — it's the surge problem, is that folks do — But that becomes — that brings me back to the question of 30 days. If the government is really in a hurry, it can answer pretty fast. So my guess is that it could get it done in 35 days. So the — so the argument is, does a span of whether it's 30 days or 45 days, is that so hurtful to the policy that the government seeks to implement that it's good cause? That's the question, right? Your Honor, respectfully, I would quarrel with the premise that it's that simple. I don't think that it can be assumed that it takes, you know, a matter of a few days to respond to hundreds or thousands of comments. I mean, that can take some time, even if the agency were to think these comments, you know, lack merit, but, you know, perhaps they're very long. Perhaps they want to, you know, make sure to have addressed them so they don't have to go and kind of re-up the process again. And what's the standard that the government has to show for good cause? That is to say, the argument you're making — don't worry about the time. We'll make sure you get a chance to respond. Thank you, Your Honor. The argument you're making is that there would be a response in relation — in response — there would be a response after the notice goes out that would be adverse to the government. Now, on what do you base that? I think it's a predictive judgment, Your Honor, based on just the facts before the agency. Well, some people call it a predictive judgment. Some people call it speculation. What's the — what's the standard the government has to satisfy in order to show that there's good cause for avoiding notice and comment? I believe as to its assessment of the facts, it would be a very lenient standard. I think something like arbitrary and capricious assessment of the facts. And I think deference would be due, and there wouldn't be — it would be kind of no second-guessing of the ultimate judgment made, would be. With that, Your Honor, I'm happy to address the Court. Thank you. Good morning, Your Honors. May it please the Court, Lee Gallant from the ACLU for East Bay. Let me just start, I think, with the last thing you were discussing with my opponent on good cause. The sole piece of evidence in the entire administrative record was one sentence in a Washington Post article about a different policy, a family separation policy, which simply said smugglers — the one sentence which said smugglers are telling people to move quickly to come into the country. It didn't say that people were responding to that. It didn't have any — that is an extraordinary — I mean, we recognize that the district court said that was enough. We think that was erroneous. That is an extraordinary ruling based on one sentence. And just with respect to the government, the standard is not deferential. This Court has repeatedly said that the standard is a high bar, that the notice and comment requirements in the APA must be taken seriously. We're talking about 30 days. And I would note also, Your Honor, that the government's whole argument is we don't want to tell anybody about this because then there will be an immediate surge. The President went on TV, national television, and announced that they were going to do this before they issued the rule. So I think — Sotomayor, how long before? I apologize, Your Honor. I do not have the exact date. I believe it was one week to 10 days. But I can submit that if Your Honor would like. So we do believe that notice and comment was required here, that the government didn't meet the high bar for good cause or foreign affairs. Judge Bybee said that there was a notice and comment violation. He did, of course, say the district court can look at additional evidence put in. The only evidence the government had was that one sentence. And just before I drop this point, I would just read that one sentence to you. Smugglers now tell potential customers of the Americans do not jail parents who bring children and to hurry up before they might start doing so. A different policy, one sentence that doesn't say whether people actually would respond to something like that. So I — that is our position on notice and comment. Just turning back to the beginning of the case, our position as we've set forth in our briefs is that Laird controls — Laird made very clear that a State panel's published decision, and it has to be published, is the law of the circuit, and there are no exceptions. And this was not a hurried decision. Isn't a motions panel, though, actually considering a different — somewhat different issue? That is, whether or not this Court should grant a stay of the injunction that the district court granted? And we look to Enkin for guidance. Roberts. That's a fair point, and I think — but what I think I would say is it goes to parts of what the district court did. It may be that you would apply law of the circuit with whatever clearly erroneous exceptions you want for the injunction part, for the equities, but not on questions of law. We believe that would be the same question that was before the State panel. And Judge Bybee, as you know, wrote at length about the statutory question you were asking the government about. So I think on most of it — but I would say, Your Honor, that whether you apply law of the circuit or law of the case, the exceptions even for law of the case are very difficult to meet as the government has conceded. You would have to show clearly erroneous, manifest harm to the government. And so I think it would be appropriate if this Court wanted to have alternative holdings that the State panel binds completely, but in any event, we find persuasive Judge Bybee's — Judge Bybee's opinion. Here's my problem with the argument that says that the decision, even if published, of the motions panel is binding on questions of law. And that is, the procedures for motions panels are different. Unless there's some exception made by the motions panel — I don't think there was one made here — the briefing is abbreviated. Right. You hear argument on an accelerated schedule, if you hear argument at all. Was there argument held in this case? There was not, Your Honor. So we've got abbreviated briefing. We've got no argument. We've got an accelerated pace of deciding the case. We also have, as a practical matter, the fact that at the very beginning of each month, the identity of the judges on the motions panel is known to the general public, particularly to repeat players such as the government, which offers the opportunity for — at least a limited opportunity for judge shopping. There are lots of reasons, it seems to me, not to give binding effect to decisions of a motions panel, even if published and even on a question of law. How do you respond to that? Your Honor, those are all fair points. And what we would say is we've laid out why we do think LAIR is the law of this circuit in terms of when a state panel would bind. But those are all fair points. And what we would say in this case is that Judge Bybee wrote at length, and I think you don't necessarily need to decide in this case should we give the state panel complete effect, that you can decide that Judge Bybee's opinion was persuasive and write on your own and affirm on that ground. I think there's no reason you necessarily need to hold in this case that LAIR controls, and in all state panel decisions, the state panel binds, the merits panel. I think that we believe that the arguments we've laid out, and obviously we've addressed those arguments on the merits in the brief, that even if LAIR doesn't control here and you're not bound by the state panel, that Judge Bybee's opinion was persuasive. And so I would just turn to those arguments very quickly, Your Honor. On standing, the government is saying that we don't satisfy Havens, that our affidavits weren't sufficient. Judge Bybee said the affidavits were sufficient, but specifically told the government if you want to contest standing on factual grounds, do so on remand at the preliminary injunction stage. The government put in nothing to contest our standing. We think that the standing arguments are absolutely foreclosed, the way Judge Bybee said, by multiple decisions of this case. It fits squarely within Havens. On zone of interest, as we ---- What do you do with Clapper? We think Clapper was a unique case that it was so speculative, so conjectural that no one could show that they had been harmed at all or would be. This, we believe, is far afield from Clapper, where the organizations have routines they use all the time. They had specific numbers, how many people that they represent in affirmative asylum applications, how many people they could potentially lose. In Clapper, there was just simply conjecture that the policy might someday apply to somebody. This is far afield where these organizations are telling you very precisely what they will have to change, what resources they will have to divert. On zone of interest, I would just make a couple of brief points. One is, Your Honor, that, as you know, this Court and the Supreme Court have said it's an extremely lenient standard. There just has to be arguably, that the organizations just arguably or the plaintiffs arguably have to fall within the zone of interest. And this Court has never said that because an organization represents individual immigrants, they could not fall within the zone of interest. I mean, that's the El Rescate case specifically. This has become basically a Lexmark argument, though, correct? That's right, Your Honor. So we've got to find some protected right that belongs to the organization. That's right, Your Honor. And I think what precedent in this circuit has said is that in the immigration area, it can be more than the immigrants. It can be organizations that help the immigrants whose specific mission is to help immigrants on a particular issue. So if you look at the El Rescate case that Judge Bybee cited, that was an organization that helped immigrants. The rule there would have, the rule being challenged had to do with what kind of interpretive services would be used in removal proceedings. Obviously, it wasn't the organizations who were in removal proceedings. They were simply challenging the rule because their clients were affected. That's exactly what's going on here. Havens as well. It wasn't the organization that was being denied housing. It was individuals. So we think under the lenient standard, Judge Bybee was absolutely correct that the zone of interest. And the government has made a point of saying, well, Judge Bybee didn't fully discuss the jurisdictional provisions. The government cited those jurisdictional provisions. Judge Bybee didn't need to discuss them. The government cited those to the Supreme Court at the State decision. And the reason Judge Bybee didn't need to is because those jurisdictional provisions, as this Court has said in Regents Note 19, deal with the immigrant and what channels the immigrant can go through to get review, not organizations. On the merits, I would just say that I think, as Judge Paez has said, that the statutory language is what's critical. And what Judge Bybee said is the government's distinction between, well, yes, you can apply for asylum if you enter between a port of entry, but you can never get it, the government can have a categorical rule, would make a mockery of the statute. And the government says, well, asylum is discretionary. Well, of course. But the point is it can be taken into account in a limited way, as this Court and the BIA have said, at the end of the process, but you cannot have a categorical rule that would negate the very specific language that Judge Paez read that says Congress went out of their way to say you may apply between ports of entry. Obviously, Congress didn't expect the Attorney General, consistent with that, to come out and say, sure, apply, but we're going to immediately deny you the minute you submit your application. How do you respond to the government's argument that you may apply, but there are lots of other things in the statute, quite close in proximity in the text, to reasons why you can't get it? Right. I'm glad you asked that, Your Honor. So the government's main example is if you're an aggravated felon, you're ineligible for asylum. And I think the reason the analogy the government makes is not apt is because Congress didn't go out of its way in the application part of the statute to say aggravated felons may specifically apply for asylum. And I think that's the difference. Congress thought about this issue and decided that anybody who entered between a port of entry to ensure we were consistent with international law and the reality on the ground that people can't simply get to a port of entry sometimes to say you may apply. It would be very odd if Congress thought the Attorney General could simply negate that. So I think the analogy would only be apt if Congress had said aggravated felons may specifically apply for asylum, but then let the Attorney General or then Congress were to say in the very next statute, but you may not be eligible for it. That would be an odd statute. Would there be an additional argument along the lines of, well, aggravated felon, that's status or characteristic of the individual quite irrespective of the manner in which the application is made? I think that would be an additional argument, Your Honor. I think they are qualitatively different. I think the principal argument we were making on the statutory text is that Congress went out of its way to specifically say may apply, but I think you're right to point out that those are qualitatively different about the status versus something that often immigrants have no control over because smugglers bring them to a particular place. They don't know where the port of entry is. Sometimes they're 500 miles away with a little child. They can't walk there, so they go up to the first place they can find a Border Patrol agent and apply, and I think that's why that language. And Congress put it in in 1980 and then specifically reaffirmed it in an even stronger language in 1996. So unless there are no other judges. So one member of the motions panel, Judge Levy, you know, felt that there was some merit to the government's argument, and in fact, Judge Levy dissented. He would have granted the stay. Right. Does that suggest that the statute might be ambiguous? We don't think so, Your Honor. I don't know of any rule that this Court has ever laid down or the Supreme Court that said because there's a dissenting judge. But, you know, I'm just saying there's a judge. Right. And with respect to Judge Levy, we strongly disagree with his reading of the statute. We do not think it would have made sense for Congress to say, and twice now, in 1980 and 1996, you may apply regards to it. Congress looked at this issue, understood how dangerous it was to eliminate asylum for people who couldn't make it to a port of entry and put that language in. So all I would say is we respectfully disagree with Judge Levy on that point. So one of the other issues that you might want to address is the scope of the injunction that was granted here. Right. You know, there's been quite a bit of concern about the scope of a nationwide injunction. And I would like you to address that. Is it appropriate here? We do think it's appropriate here, Your Honor. We don't think that Judge Tiger abused his discretion. The government offered only an alternative of making it client-specific, but specifically said to the government twice, both at the TRO stage and at the PI stage, tell me how that would be practical, how that would work. And the government never gave him an answer. And I think there's good reason for that. I think, for one, these organizations do not have the resources to represent everyone. So much of what they do is to provide training materials, advice to immigrants, so that immigrants can try and help themselves. That can't be client-specific because those are not retained clients. That would be an enormous part of their work that would be eliminated if it was client-specific. On the nationwide part, what I would say is the government hasn't advanced a geographical limitation. And I think for good reason. For example, Law Lab, one of the plaintiffs, represents people outside the Ninth Circuit. The other point I would make about that is that clients would never reach the Ninth Circuit because, for example, they would enter in Texas, they would have one of those expedited removal hearings, what are called credible fear hearings. If they failed, they would never make it to the Ninth Circuit. And so they would lose clients in that way. So I think there are a variety of reasons why a narrower injunction wouldn't work. And, you know, as Your Honor knows, Judge Bybee dealt with that, and the government made a big deal of it in their Supreme Court stay papers. And the Supreme Court has narrowed certain injunctions, stayed other injunctions, but left this nationwide injunction. So I think at the end of the day, there is, as you said, a lot of focus on scope of injunction. But no court, as far as I'm aware of, has ever said a nationwide injunction is not appropriate where it's necessary to provide plaintiffs with full relief. And I think that's the situation here. Our affidavits show that the government never came back and explained to Judge Tiger. And the other point that Judge Tiger made about that is you would make these four organizations the most popular organizations on the border, everyone. I mean, their offices would be flooded with people saying, please represent me because the injunction only applies to people who are represented by you. I mean, the lines would be around the block. And I think Judge Tiger pointed out that would be impractical to administer. It would be very odd. The government never explained how that would work. So I think in this case, given these affidavits, given Judge Bybee's opinion, given the Supreme Court refusing to narrow the injunction, it is appropriate here. Do we even have a choice given our case law that's cited by Judge Bybee? For example, in the Hawaii case, we state quite clearly that if it's an immigration case, a nationwide injunction is appropriate. Now, even if that were wrong, are we bound by the panel opinion in Hawaii? Thank you, Judge Fletcher. I think that is an additional point that I didn't hit that I wanted to hit, is that this Court has said multiple times that in an immigration case and an APA case, the default remedy is a nationwide injunction. I think Judge Bybee laid that out very clearly. I just wanted to make the additional point that I think there's record evidence to say that even if you weren't going to say it's automatically appropriate to have a nationwide injunction in immigration APA cases, which, as you said, is the law in this circuit, the affidavits in this case are unrebutted by the government and would show that a nationwide injunction is appropriate. Unless there are further questions, Your Honors, I think I will. Thank you, Your Honors. Thank you. Now, the government has sought to reserve five minutes. We took you over. You had about a minute left. Why don't we put four minutes on the clock? That will more or less compromise it out for you. I appreciate it. Thank you, Your Honor. I want to make sure to hit good cause briefly and also the scope of the injunction issue that was occupying the latter part of my friend's argument. On the good cause issue, Your Honor, the district court did more than rely on simply one sentence in the record. It relied on that common-sense intuition found in that article along with rising family unit numbers, and that was in the context of the rule's overall explanation that we have this huge increase in family units that are arriving. The population of family units is a very, very challenging group because it's just difficult to detain them. We have limited capacity, other strictures. So as we explain, and this is at pages 20 through 23 of our reply brief, the district court said, look, this shows that these different features show a rational connection between the evidence and the conclusion the government drew, that migrants respond to incentive structures, changes in policy. It doesn't need to be the same policy. It's just the common-sense, reasonable intuition that if somebody's interests or equities are affected by a policy in a certain way, they can respond in the way that's most beneficial to them. That was a correct conclusion, and it shows that the district court properly concluded once it had the record that the good cause exception was satisfied here. On the scope of the nationwide injunction, Your Honor, the position we've said is that the injunction needs to be limited to the cognizable injuries of the plaintiffs. Before you get to the, I'll call them policy arguments, how do you deal with what Judge Bybee wrote, but really what Judge Bybee relied on, which is a fairly long line of cases, Hawaii probably only the most recent, in which in full argument with a regular argument panel, we say nationwide injunctions are appropriate in immigration cases. Aren't we bound by that? Your Honor, I think that the Court has perhaps not been perfectly uniform on this issue in either the APA context or the immigration context. I'm not interested in APA for the moment. Let's focus on immigration. I believe in, I want to say in the Washington case, it did say a similar thing, but in certain cases, Your Honor, I believe the Court has remanded even in the immigration context to say, you know, look, you need more of a record here to show that a nationwide universal injunction is actually needed. I think I'd analogize it to a situation, Your Honor, where an immigration case comes to this Court on an issue, a legal issue, where other circuits have ruled on it, and perhaps say that all those other circuits have gone one way. Three circuits have ruled, you know, this is the rule. Is that the case here? It's not the case here, Your Honor, but it illustrates kind of the difficulty with a nationwide scope of an injunction. I don't think that this Court, even under the principle of the importance of uniformity in the immigration context, would feel that it was compelled to reach the same conclusion as those other circuits, even though that would mean ---- But you're giving me a case that's not in front of us. I understand it would be more difficult if we had one answer out of the Fifth Circuit and a different answer out of the Ninth Circuit, and the injunctions would accordingly be different or maybe an injunction in one circuit and not in the other, but that's not the case here. It's not because the district court ---- in part because the district court preempted the possibility of percolation in a really meaningful way by issuing this sort of an injunction, Your Honor. Is there sort of parallel litigation going on in the Fifth Circuit in which the injunction was not issued because of our injunction? There was ongoing litigation in the D.C. district court, Your Honor, that, you know, it necessarily, of course, slowed down, or I guess I'd say reasonably slowed down, and ultimately the district court judge did rule against the rule there. But the point is, Your Honor, that an injunction here prevents other courts from meaningfully considering the issues and having kind of an impact to their ruling in the way that the district judge here was given the opportunity, Your Honor. And our pitch is simply, you know, APA context, immigration context, these are not special contexts that defy the normal principles of Article III limitations, equity, and there was a way ---- it's the plaintiff's burden to show what their harm is and how that could be addressed. And a limitation to their bona fide clients, that means, you know, whatever number of clients they would get as a bona fide matter, would address their cognizable injuries. And our submission is ---- I acknowledge that decisions of this Court have recognized uniformity as being a very strong consideration. We've cited areas where this Court has gone a little bit the other way. There was, of course, a stay panel decision limiting things to the Ninth Circuit recently. There was the Trump v. IRAP decision narrowing an overbroad injunction that we've cited. And we just say that the normal rules of equity and Article III should apply with full force here and bar a nationwide injunction. Okay. Any further questions from the bench? Okay. Thank you, Your Honor. I thank both sides for their very helpful arguments. East Bay Sanctuary Covenant v. Trump submitted for decision.
judges: Fernandez, W. Fletcher, Paez